| Housing Authority of | : | |
| Lackawanna County | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | No. 215 C.D. 2024 |
| | : | No. 512 C.D. 2024 |
| Denise Schnars, | : | Submitted: December 9, 2024 |
| | : | |
| Appellant | : | |

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE LORI A. DUMAS, Judge
HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                        FILED: February 5, 2025

Denise Schnars (Tenant) appeals from a September 18, 2023 order of the Lackawanna County Court of Common Pleas (trial court), entering judgment in favor of the Housing Authority of Lackawanna County (Housing Authority).  For the reasons that follow, we affirm in part and reverse in part.

## I.   BACKGROUND

On October 20, 2022, the Housing Authority filed a one-count eviction complaint with the trial court, alleging that Tenant engaged in harassing and criminal activity directed towards contractors hired by the Housing Authority to perform work at Tenant's housing site.   Housing Authority's Complaint, 10/20/22,

Reproduced Record (R.R.) at 1.[1]  The trial court docketed the complaint at No. 2022-04231.  Tenant, acting *pro se*, filed an answer and new matter.  Tenant's Answer and New Matter, 11/7/22, Original Record (O.R.), 512 C.D. 2024 at No. 5.

On November 2, 2022, the Housing Authority filed a three-count eviction complaint with the trial court, alleging that Tenant: (1) failed to pay rent; (2) failed to allow maintenance workers to inspect and/or make repairs to her apartment; and (3) failed to comply with the recertification process.  Housing Authority's Complaint, 11/2/22, R.R. at 3.  The trial court docketed the complaint at No. 2022-04401.  Tenant, acting *pro se*, filed an answer, new matter and counterclaim.  Tenant's Answer, New Matter and Counterclaim, 12/1/22, R.R. at 6.  The counterclaim consists of a single count titled "Breach of Contract."  *Id.*, R.R. at 11.

On April 20, 2023, the Housing Authority filed a "Motion to Dismiss [Tenant's] Counterclaim and to Prohibit [Tenant] from Asserting Defense of Habitability as a Matter of Law" (motion to dismiss counterclaim).  Housing Authority's Motion to Dismiss Counterclaim, 4/20/23, R.R. at 30.  Citing the case of *Ford v. Philadelphia Housing Authority*, 848 A.2d 1038 (Pa. Cmwlth. 2004), the Housing Authority argued that a contract action for warranty of habitability does not apply to public housing.  *Id.*, ¶¶7-11, R.R. at 31.  On May 8, 2023, Tenant, then represented by counsel, filed (1) an "Agreement to Withdraw Claims for Breach of Implied Warranty of Habitability" (agreement to withdraw) and (2) a motion to consolidate her two appeals.  Tenant's Agreement to Withdraw, 5/8/23, R.R. at 33; Tenant's Motion to Consolidate, 5/8/23, O.R., 215 C.D. 2024 at No. 22.  In the

---

[1] We note that Tenant's Reproduced Record is not properly numbered as directed in Pa.R.A.P. 2173 (reproduced record shall be numbered separately in Arabic figures followed by a small "a").  For convenience, we will refer to the Reproduced Record as paginated by Tenant.

agreement to withdraw, Tenant withdrew her counterclaim to the extent it pled a claim for breach of implied warranty of habitability. Tenant's Agreement to Withdraw, ¶¶9-11, R.R. at 34.

On May 15, 2023, Tenant filed a "Brief in Opposition to [the Housing Authority's Motion to Dismiss [Tenant's] Counterclaim . . . ." (brief in opposition to the Housing Authority's motion to dismiss). Tenant's Brief in Opposition to Motion to Dismiss, R.R. at 37. Citing *Ford*, Tenant's brief in opposition to the Housing Authority's motion to dismiss theorized that a contract action for *implied* warranty of habitability does not apply to public housing. Tenant posited that "since the [Housing Authority] is already mandated to provide habitable environments under federal law, there is no need to implement the implied warranty of habitability to protect tenants." Tenant's Brief in Opposition to Motion to Dismiss at 4, R.R. at 40. The brief in opposition to motion to dismiss asserted, however, that "Tenant's counterclaim seeks damages for both breach of contract and tortious conduct. Incorporated into the counterclaim is the allegation that [the Housing Authority] violated the 'warranty of habitability.'" *Id.* Tenant stressed that under Section VII of the lease,[2] the Housing Authority explicitly agreed to provide a habitable living environment. *Id.* Tenant also suggested that insofar as the Housing Authority might argue that these causes of action were not sufficiently pleaded in Tenant's counterclaim, the Housing Authority could have filed preliminary objections rather than answering the counterclaim. *Id.* at 5, R.R. at 41.

_____

[2] The lease can be found at page 392 of the Reproduced Record.

The trial court held argument on the motion to dismiss counterclaim on May 30, 2023.[3]  In an order issued that same day, the trial court granted, without further explanation, the Housing Authority's motion to dismiss counterclaim and Tenant's motion to consolidate the two eviction complaints.  Trial Court Order, 5/30/23, R.R. at 42.

## II.    TRIAL

On June 9, 2023, the trial court held a bench trial and evidence was presented on the following.[4]

### A. <u>Tenant's Alleged Failure to Cooperate with Maintenance Personnel</u>

The Housing Authority presented the testimony of Judy Thiel, the property manager for Tenant's apartment complex.  Thiel testified that Tenant raised concerns with the Housing Authority about the habitability of her apartment unit because "in the closet there was mold that had to be taken care of[,] and [Tenant] stated in another part of the unit she thought there was mold."  Trial Transcript, 6/9/23, Notes of Testimony (N.T.) at 19.  Thiel stated that maintenance personnel went to Tenant's apartment to inspect the area, but Tenant would not allow them to see what needed to be done "because it was too extensive that she couldn't be not – [sic] - could not be in the unit while they did anything."  *Id.*, N.T. at 20-21.  Thiel

---

[3] The May 30, 2023 proceeding ostensibly began as an argument on a motion *in limine* filed by the Housing Authority; however, it morphed into an argument on whether Tenant's counterclaim contained any causes of action in addition to breach of implied warranty of habitability.  The argument was transcribed and appears in the Original Record of the appeal docketed at 215 C.D. 2024, at Docket Entry No. 50.

[4] The trial transcript can be found on page 171 of the Reproduced Record.

further testified that on a prior occasion, Tenant had been instructed to clean out the closet area and notify staff so that they could return and evaluate the premises and/or perform necessary work. Tenant never contacted the Housing Authority. *Id.*, N.T. at 88. Thiel confirmed that Tenant's failure to allow maintenance personnel to enter the unit or to prepare the unit for maintenance was a lease violation. *Id.*, N.T. at 23. Finally, Thiel stated that on July 14, 2022, the Housing Authority issued Tenant a notice to quit because Tenant would not allow maintenance personnel "to do the repairs in her unit [or] to see what was needed to do the repairs[]." *Id.*, N.T. at 19; Housing Authority Exhibit 6.

The Housing Authority also presented the testimony of Leo "Skip" Southard, a maintenance employee of the Housing Authority. Southard testified that he went to Tenant's apartment approximately five times to assess the mold issues. Trial Transcript, N.T. at 93. Southard indicated that he could never access the area, particularly Tenant's closet, because Tenant "had a lot of stuff" in the apartment. *Id.*, N.T. at 94. Southard stated:

> Q. And to the best of your knowledge, did she ever clear out that area to allow you to get in there?
>
> A. No, not until the last time I was in there[,] which was a couple months ago maybe, I guess.
>
> Q. So even after all this time she knows what has to be done and it still hasn't been done?
>
> A. No.
>
> Q. So[,] were you even adequately able to assess the situation in her unit?
>
> A. No, I actually didn't see it.
>
> Q. This is through no fault of your [own] though, right?

5

A. No.

Q. Assuming you were able to get access to the closet and the area, is the Housing Authority ready, willing, and able to do whatever is necessary to remedy?
A. Sure. Yeah, we could have did [sic] it.

*Id.*

Tenant testified on her own behalf. Tenant stated that she moved into her apartment in October of 2012. Trial Transcript, N.T. at 121. At the time of the trial, she was not staying in the apartment due to mold. *Id.*, N.T. at 121-22. Tenant first noticed mold and moisture in her apartment in 2018. *Id.*, N.T. at 125. Tenant indicated that the moisture issues were initially caused by a hot water heater that was fixed and eventually replaced by maintenance personnel. *Id.* Tenant testified that she periodically purchased "moisture absorbers" to collect moisture in the air. *Id.*, N.T. at 126-28. Tenant also stated that she had the substance in her apartment tested and that the test was positive for mold. *Id.*, N.T. at 129. Tenant stated that she suffered headaches because of the mold. *Id.*, N.T. at 135. Tenant denied that she prevented maintenance personnel from accessing her apartment or performing work. *Id.*, N.T. at 164, 174.

**B. Tenant's Alleged Failure to Comply with the Recertification Process**

Thiel testified that the Department of Housing and Urban Development (HUD) requires all tenants to participate in an annual recertification process. Trial Transcript, N.T. at 24. Thiel stated that she sent Tenant a letter on August 1, 2022, scheduling Tenant's recertification appointment for August 8, 2022. *Id.*, N.T. at 25; Housing Authority Exhibit 8. Tenant was an "October 1st recert[ification.]" *Id.*, N.T. at 84. Tenant responded in writing, via her attorney, advising Thiel that she

would not participate in the recertification process. *Id.*, N.T. at 27; Housing Authority Exhibit 9. Thiel testified that failure to participate in the recertification process is a lease violation. *Id.*, N.T. at 29. As a result, on August 17, 2022, Thiel issued a notice to quit for Tenant's failure to participate in the recertification process. *Id.*, N.T. at 27; Housing Authority Exhibit 10. Thiel stated that as of June 9, 2023 (the date of trial), Tenant had not yet completed her 2022 annual recertification. *Id.*, N.T. at 84.

During her testimony, Tenant acknowledged that she received a notice from Thiel on August 1, 2022, concerning her annual recertification paperwork. Trial Transcript, N.T. at 170. Tenant stated that she told Thiel it would be difficult to meet with her because "it takes me a lot longer to get all the documents prepared[.]" *Id.* Tenant further acknowledged that her lawyer had sent a letter to Thiel, advising her that Tenant would not participate in the recertification process while the eviction was pending. *Id.*, N.T. at 202. Tenant testified that she provided the completed recertification application in February of 2023 when she attached it to her discovery responses. *Id.*, N.T. at 171-72. Tenant also stated that because the Housing Authority was not satisfied with the application, she resubmitted it on several occasions. *Id.*, N.T. at 172-73. Finally, on cross-examination, Tenant conceded that her recertification application was late. *Id.*, N.T. at 205.

## C. Tenant's Rent Abatement

Thiel testified that on July 7, 2022, the Housing Authority issued a notice to quit because Tenant had failed to pay her rent by the fifth of the month. Trial Transcript, N.T. at 14-15; Housing Authority Exhibit 4. Thiel stated that Tenant stopped paying rent after the notice to quit was issued because she believed

7

that her unit was uninhabitable. *Id.*, N.T. at 42. Thiel indicated that Tenant owed rent for the months of July, August, September, and October of 2022. *Id.*, N.T. at 15.

In response, Tenant testified that she deposited rent for July, August, and September 2022 into an escrow account with the trial court. Trial Transcript, N.T. at 200, 205. Tenant noted that she sent a letter to Thiel in April of 2022, requesting a reduction in rent for the cost of mold testing. *Id.*, N.T. at 147. Tenant stated that she began abating rent in July of 2022 because of habitability issues in her unit. *Id.*, N.T. at 147-48, 153. Tenant's intent to abate rent was conveyed in an email from her attorney to the Housing Authority's counsel. *Id.*, N.T. at 151.

Tenant admitted that the Housing Authority offered her a different apartment in February of 2022; however, it was not in the same community. Trial Transcript, N.T. at 178-79. Tenant acknowledged that she did not accept the Housing Authority's offer stating, "Why should I be forced from my home for issues that weren't of my doing? Why should I be forced from my community?" *Id.*, N.T. at 180. Tenant testified that the Housing Authority then offered to put her on the list for the next available one-bedroom apartment in her current complex. *Id.* Tenant accepted the offer because she believed an apartment would be available in approximately four months; however, the Housing Authority later rescinded the offer when it began eviction proceedings based on Tenant's alleged harassment of contractors. *Id.*, N.T. at 180-81.

### III.   TRIAL COURT'S VERDICT/POST-TRIAL MOTIONS

On June 14, 2023, the trial court entered a verdict in favor of the Housing Authority, finding that the Housing Authority had satisfied its burden of

8

proof on three of the four counts it raised in its eviction complaints. Specifically, the trial court found that Tenant violated the following sections of the lease agreement: (1) Sections VII(c)(1), (2) and XIV(a)(5) by failing to participate in and complete the recertification process; (2) Section X, "Tenant Responsibilities" (b) and Section XIV(a) by failing to pay rent in July, August, and September of 2022; and (3) Section IX(o) by failing to act in a cooperative manner with the Housing Authority staff. [5] *See* Trial Court Verdict, 6/14/23, ¶¶1-7, R.R. at 99-101. Thus, the trial court ordered that Tenant was to vacate the premises by June 30, 2023. *Id.*, ¶11, R.R. at 101. In the event that Tenant failed to comply, the trial court indicated that "the [Housing Authority] can seek an order of possession for [Tenant's] premises . . . from the Office of [the Magisterial District Judge (MDJ)]." *Id.*, ¶12, R.R. at 101. The trial court further stated that "[the MDJ's office] shall comply with a request for an Order of Possession upon presentation of this order." *Id.*, ¶13, R.R. at 102.

Tenant filed a "Motion for Post-Trial Relief . . . Requesting a New Trial and/or the Modification of the Verdict" (motion for post-trial relief). Tenant's Motion for Post-Trial Relief, 6/23/23, R.R. at 103. By order dated August 11, 2023, the trial court denied Tenant's motion for post-trial relief and judgment was entered in favor of the Housing Authority on September 18, 2023. *See* Trial Court Order, 8/11/23, R.R. at 128. Tenant then filed a notice of appeal to the Superior Court.[6]

---

[5] The trial court also determined that the Housing Authority did not meet its burden of proving that Tenant engaged in criminal activity in violation of Section XIV(a)(7) of the lease. That finding is not challenged on appeal.

[6] By order dated March 7, 2024, the matter was transferred to Commonwealth Court and was docketed at No. 215 C.D. 2024. On April 10, 2024, this Court issued an order noting that the trial court order on appeal appeared to involve consolidated actions before the trial court. Citing the case of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), the order advised that Tenant may wish to file an additional notice of appeal to preserve her appellate rights. On October 5, 2023, **(Footnote continued on next page…)**

9

The trial court ordered Tenant to file a statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). Tenant responded by raising 27 alleged errors challenging the trial court's ruling related to Tenant's counterclaim; the trial court's finding that Tenant improperly abated rent; the trial court's finding that she refused to cooperate with the Housing Authority's maintenance personnel; the trial court's conclusion that Tenant failed to comply with the recertification process; and asserting that the trial court improperly "streamlin[ed]" the order of possession process. O.R., 215 C.D. 2024 at No. 48; O.R., 512 C.D. 2024 at No. 23.

## IV. TRIAL COURT'S PA.R.A.P. 1925(a) OPINION

In response to Tenant's statement of errors complained of on appeal, the trial court issued an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a), addressing the following.

## A. **Tenant's Counterclaim**

The trial court noted that Tenant's counterclaim raised one count for breach of contract. The counterclaim stated:

COUNT 1-BREACH OF CONTRACT

2. [Tenant] has been a resident in good standing at 47 Kennedy Boulevard, Scranton[,] PA 18504 for ten (10) years.

3. The current executed lease was signed in September 2021 with current property manager Judy Thiel and is not the lease shown in Exhibit A of [the Housing Authority's] Complaint.

Tenant filed a second notice of appeal. The second notice of appeal was docketed at No. 512 C.D. 2024. By order dated July 19, 2024, this Court consolidated Tenant's appeals.

4. The lease in effect is attached as Exhibit 3.

5. [The Housing Authority] violated the warranty of habitability of the subject premises and did not address major repairs and issues as requested in a timely manner. See Exhibit 1 and 2 to this pleading.

6. [The Housing Authority's] failure to timely address the structural defects and habitability issues inside and outside the unit[,] which directly caused a moisture problem to continue and get worse leading to an increased accumulation of mold inside the unit.

7. Major problems and failed repairs included damage to the outer wall and damage to the insulation of the outer wall, and damage to the inner wall that contributed to serious mold issues in the subject premises are attached as Exhibit 4 [sic].

8. [Tenant] informed [the Housing Authority] of her cares, concerns, and maintenance issues in a letter sent in December 2021. See Exhibit 1.

9. [The Housing Authority's] response is attached as Exhibit 2.

10. [The Housing Authority] by correspondence dated February 17, 2022, advised that, as was its obligation, it would move [Tenant] to a separate unit. See Exhibit 5.

11. Subsequently, [the Housing Authority] revoked [its] offer and violated [its] obligation to relocate [Tenant] and instead sought to evict [Tenant].

12. The repairs were not completed by July 2022, when [Tenant] began to withold [sic] rent, abatement, [sic] for the repairs which were still not completed since November 2021 as per her right under the lease agreement.

13. [Tenant] was required to pay for the Mold Test cost out[-]of[-]pocket. Attach Receipts as Exhibit 6 [sic].

11

14. [Tenant] has suffered economic loss to include out[-]of[-]pocket costs for cleaning supplies necessitated by the reoccuring [sic] mold.

15. [Tenant] has incurred costs, expenses[,] and wage loss for being required to miss work and accept less hours due to the need to respond by [sic] the [Housing Authority's] demands and its failure to address the habitability issues of her unit rending [sic] her sick and required medical attention.

16. [Tenant] has suffered economic loss to include out[-]of[-]pocket costs for mold testing kits and expenses for analysis of testing. Exhibit 6.

17. [Tenant] is further entitled to any/all rent payments which she property [sic] withheld, through abatement, from July 2022 to the present.

WHEREFORE, [Tenant] requests that this Court grant her claims for relief and enter judgment in her favor and award [Tenant] her damages, fees[,] and costs, including attorney fees, reasonably incurred in connection to this matter.

Tenant's Counterclaim, ¶¶2-17, R.R. at 11-13.

The trial court noted that "[i]nitially, this court dismissed Tenant's entire counterclaim because of the language regarding a breach of warranty of habitability in averment 5. However, Tenant still pled with sufficient language a claim for breach of contract. As such, this court will address the merits of Tenant's counterclaim." Trial Court Pa.R.A.P. 1925(a) Opinion (Trial Court Opinion), 11/30/2023, at 19.[7] The trial court emphasized that in order to sustain the burden of proof in a contract claim, Tenant was required to establish by a preponderance of the evidence that: (1) a contract between the parties exists; (2) the Housing Authority breached the contract; and (3) Tenant was harmed as a result of the breach. *Id.*

_____

[7] The trial court's opinion can be found on page 151 of Tenant's Reproduced Record.

The trial court highlighted Tenant's testimony that excess moisture in her unit resulted in harm to both Tenant and her belongings. Furthermore, Tenant testified that she made the Housing Authority aware of the issue, but the Housing Authority breached the contract because it failed to remedy the problem, "resulting in physical and economic harm." Trial Court Opinion at 19. In support, Tenant submitted photographs that "clearly show[ed] water damage." *Id.* In addition, Tenant testified that she had headaches and nausea as a result of the mold. *Id.*

The trial court noted that Tenant's testimony was contradicted by the testimony of Thiel and Southard, as well as the exhibits. The trial court observed that "Tenant admitted [the Housing Authority] offered her alternative housing but she rejected the offer." Trial Court Opinion at 19. Moreover, addressing the Housing Authority's repair of the unit, the trial court stated, "it is clear that [the Housing Authority] tried to gain access numerous times but was unsuccessful." *Id.* at 19-20. Thus, the trial court held that Tenant failed to satisfy her burden of showing that the Housing Authority breached a duty of care to her. Per the trial court, "the testimony and exhibits clearly demonstrate otherwise." *Id.* at 20.

## B. **Tenant's Alleged Lease Violations**

Turning to Tenant's alleged lease violations, Section XIV of the lease sets forth the procedures the Housing Authority must follow when terminating a Tenant's lease. This section states that the Housing Authority may terminate the lease "only for serious or repeated violations of material terms of the [l]ease, such as failure to make payments due under the lease or to fulfill Tenant obligations set forth in [S]ection IX above, or for other good cause." Section XIV(a) of the Lease Agreement, R.R. at 405. Furthermore, Section XIV of the lease lists violations that

13

constitute serious violations of material terms.  The list includes, but is not limited to:

>    (1) The failure to pay rent or other payments when due;
>
>    . . . .
>
>    (5) Failure to supply, in a timely fashion, any certification, release, information, or documentation on Family income or composition needed to process annual reexaminations or interim redeterminations.

Section XIV(a)(1), (a)(5) of the Lease Agreement, R.R. at 406.  The trial court held that the Housing Authority presented sufficient evidence to find the following serious violations of material terms of the lease.  In reaching its decision, the trial court emphasized that each ground standing on its own constituted a serious violation of a material term of the lease.  Trial Court Opinion at 19.

### 1. <u>Tenant's Alleged Failure to Cooperate with Maintenance Personnel</u>

The trial court noted that Section IX(o) of the lease requires Tenant to act in a cooperative manner with Housing Authority staff.  The trial court determined the testimony of Thiel, Southard, and Tenant herself established that the Housing Authority's repeated attempts to gain entry to Tenant's apartment for purposes of inspecting and/or repairing the mold were "without success."  Trial Court Opinion at 16.  Based on this evidence, the trial court concluded that the Housing Authority met its burden to show that Tenant was uncooperative with Housing Authority staff.

14

## 2. **Tenant's Alleged Failure to Comply with the Recertification Process**

The trial court further held that the Housing Authority successfully met its burden of proving that Tenant violated Section VII(c) of the lease when she failed to comply with the annual recertification process. The trial court emphasized that Section VII(c) of the lease sets forth a tenant's obligations regarding the recertification process and explicitly provides that failure to supply information when requested is a serious violation of the terms of the lease that may result in the lease's termination. Trial Court Opinion at 16.[8] Here, Thiel testified that Tenant

---

[8] Section VII(c)(1)-(2) of the lease discusses the lease's terms and conditions. Section VII(c) states in part:

> (c) Redetermination of Rent, Dwelling Size and Eligibility. The rent amount as fixed in Part I of the Lease Agreement is due each month until changed as described below.
>
> > (1) The status of each family is to be re-examined at least once a year. Tenants paying Flat Rent shall have their incomes reexamined every three years. At the annual recertification. [sic]
> >
> > (2) Tenant promises to supply [the Housing Authority], when requested, with accurate information about: family composition, age of family members, income and source of income of all family members, assets, community service activities, and related information necessary to determine eligibility, annual income, adjusted income and rent. . . .
>
> Failure to supply such information when requested is a serious violation of the terms of the lease and [the Housing Authority] may terminate the lease.

Section VII(c)(1)-(2) of the Lease Agreement, R.R. at 398 (citation omitted).

clearly advised she would not participate in the recertification process. Additionally, Thiel testified that as of June 9, 2023 (the date of trial), Tenant had yet to complete the annual recertification process for 2022. The trial court observed that "[t]his violation alone is grounds for eviction . . . ." Trial Court Opinion at 16.

### 3. **Tenant's Rent Abatement**

Finally, the trial court concluded that the Housing Authority successfully proved that Tenant failed to comply with the rent abatement provision in Section X of the lease when she withheld rent from July through September 2022. Per Section II(a) of the lease, rent was to be paid on the first day of each month and would be considered delinquent on the fifth day of each month. Meanwhile, Section X of the lease discusses rent abatement in the event a dwelling unit is hazardous to a tenant's health. It provides in pertinent part:

> X. Defects Hazardous to Life, Health or Safety: In the event that the dwelling unit is damaged to the extent that conditions are created that are hazardous to the life, health, or safety of the occupants: . . .
>
> [Housing Authority] Responsibilities:
>
> (a) [The Housing Authority] shall be responsible for repair of the unit within a reasonable period of time after receiving notice from Tenant, provided, if the damage was caused by Tenant, household members, or guests, the reasonable cost of the repairs shall be charged to Tenant. . . .
>
> (b) [The Housing Authority] shall offer Tenant a replacement dwelling unit, if available, if necessary repairs cannot be made within a reasonable time. . . .

16

(c) Tenant shall accept any replacement unit offered by [the Housing Authority].

(d) In the event [the Housing Authority], as described above cannot make repairs, and alternative accommodations are unavailable, then rent shall abate in proportion to the seriousness of the damage and loss in value as a dwelling. No abatement shall occur if Tenant rejects alternative accommodations or if Tenant, household members, or guests caused the damage. . . .

(e) If [the Housing Authority] determines that the dwelling unit is untenantable because of imminent danger to the life, health, and safety of Tenant, and Tenant refuses alternative accommodations, this Lease shall be terminated, and any rent paid will be refunded to Tenant.

Tenant Responsibilities:

(a) Tenant shall immediately notify the Project Manager of the damage and intent to abate rent, when damage is or becomes sufficiently severe that Tenant believes he/she is justified in abating rent. . . .

(b) Tenant agrees to continue to pay full rent, less the abated portion agreed upon by [the Housing Authority], during the time in which the defect remains uncorrected.

Section X of the Lease Agreement, "Housing Authority Responsibilities" (a)-(e), "Tenant Responsibilities" (a)-(b), R.R. at 403-04 (citations omitted, emphasis in original).

In this case, the trial court noted, Tenant testified that she rejected the replacement unit offered her in violation of Section X(c) of the lease. Additionally, Tenant did not allow maintenance personnel to inspect or repair her unit. Further,

17

Tenant did not abate her rent in accordance with the lease terms. *See* Section X of the Lease Agreement, "Tenant Responsibilities" (a)-(b). Accordingly, the trial court maintains it properly ruled in favor of the Housing Authority. Trial Court Opinion at 17-18.

## V. DISCUSSION
### A. <u>Tenant's Counterclaim</u>

On appeal to this Court,[9] Tenant first argues that the trial court improperly dismissed her counterclaim. Tenant acknowledges that the trial court conceded in its Pa.R.A.P. 1925(a) Opinion that it erred in granting the Housing Authority's motion to dismiss the counterclaim. Tenant contends the trial court erred, however, when it went on to address the merits of Tenant's counterclaim and summarily dismissed it. In this regard, the trial court concluded that because Tenant denied Housing Authority personnel access to her unit and refused the Housing Authority's offer of alternative housing, her breach of contract claim was without merit.

In response, the Housing Authority asserts that despite its Pa.R.A.P. 1925(a) Opinion, the trial court at the outset properly dismissed Tenant's counterclaim. The *Ford* decision explicitly holds that a contract action for warranty of habitability does not apply to public housing. A fair reading of the counterclaim's averments shows that the counterclaim asserts nothing other than a breach of warranty of habitability. The Housing Authority challenges Tenant's attempt to

---

[9] Trial courts have broad discretion to grant or deny a new trial. *Zeigler v. Detweiler*, 835 A.2d 764 (Pa. 2003). When analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial court abused its discretion. *Id.* at 767 (quoting *Harmon ex rel. Harman v. Borah*, 756 A.2d 1116, 1121 (Pa. 2000)).

18

make a distinction between an "implied" warranty of habitability and an "express" warranty of habitability. The Housing Authority asserts that based on the holding in *Ford*, "the difference between implied or express is irrelevant since a warranty of habitability claim is totally barred as an action against a public housing agency." *Id.*

Based on our review of the averments in Tenant's counterclaim, it is apparent that she pled nothing beyond a breach of warranty of habitability. Clearly, the focus of Tenant's counterclaim is on the habitability of her unit and the damages she allegedly suffered as a result of the Housing Authority's purported failure to make necessary repairs. Because our decision in *Ford* precludes actions for breach of warranty of habitability in the context of public housing, we conclude that the trial court correctly granted the Housing Authority's motion to dismiss counterclaim in the first instance.

## B. **Tenant's Alleged Lease Violations**

### 1. **Tenant's Alleged Failure to Cooperate with Maintenance Personnel**

Tenant asserts that the trial court erred when it held that she did not cooperate with maintenance personnel because she failed to answer the door when they visited her unit. Tenant, without providing additional details, contends that "[t]he trial transcript shows [the trial court] was mistaken about the number of times [the Housing Authority] tried to access the unit." Tenant's Brief at 27. Regardless, Tenant asserts that her failure to answer the door is "irrelevant" because the Housing Authority has a key to the premises. "If entering the residence is important," Tenant states, "[the Housing Authority] has what it needs to peaceably get inside." *Id.* Tenant directs attention to Section XII(b)(3) of the lease, which addresses "Entry of

19

the Premises During Tenancy" and provides, "[i]f Tenant and all adult members of the household are absent from the dwelling unit at the time of entry, [the Housing Authority] shall leave in the dwelling unit a written statement specifying the date, time and purpose of entry prior to leaving the dwelling unit." Section XII(b)(3) of the Lease Agreement, R.R. at 405.

Tenant also focuses on the trial court's conclusion that maintenance personnel unsuccessfully tried to access her unit on July 15, 2022. To the contrary, Tenant argues, the record reflects that no one from the Housing Authority came to Tenant's apartment on July 15, 2022. Moreover, Tenant asserts, both Thiel and Southard testified that they were in Tenant's apartment on multiple occasions.

The Housing Authority responds that testimony in the record clearly reflects that Tenant "frustrated any and all attempts of [the Housing Authority] to investigate and potentially remedy any alleged issues with her unit." Housing Authority Brief at 19. Per the Housing Authority, there is more to Tenant's lease violation than failing to permit maintenance personnel to enter her apartment. Indeed, the crux of Tenant's lease violation was her failure to comply with requests that she clean out the closet area so that the Housing Authority could investigate and eventually remediate.

We believe Tenant's argument misses the mark. While both Thiel and Southard testified that, on occasion, Tenant would not answer her door when maintenance personnel and other Housing Authority representatives came to her unit, it was Tenant's failure to *cooperate* and *follow further instructions* that established a violation of Section IX(o) of the lease. *See* Testimony of Judy Thiel, R.R. at 189-90, 257-58; Testimony of Leo Southard, R.R. at 264, 283-84. The testimony of Thiel and Southard reflects that Tenant was asked on multiple

20

occasions to clean out the closet area so the problem could be assessed, but to no avail. Moreover, Tenant thwarted any inspections by maintenance personnel, insinuating the problem was too difficult to remedy. Clearly, it was Tenant's uncooperative behavior that prevented the situation from being remedied.

Accordingly, based on our careful review of the record, we cannot say that the trial court erred in holding that Tenant violated Section IX(o) of the lease.

## 2. **Tenant's Alleged Failure to Comply with the Recertification Process**

The parties do not dispute that Section VII(c) of the lease requires individuals like Tenant to complete a yearly recertification process or they may face eviction. Tenant asserts that she complied with the recertification requirements when she attached a complete copy of her recertification application to her trial memorandum. Tenant contends that "[a]t the time of trial, [the Housing Authority] had everything it needed to determine whether Tenant qualified for federally subsidized housing." Tenant's Brief at 31. Tenant argues that the late submission of her recertification application should not be considered a material breach of the lease agreement.

The Housing Authority responds that the testimony at trial was "indisputable" that Tenant did not timely recertify as required by the lease. Housing Authority Brief at 20. Thiel testified that annual recertification is required for all HUD tenants. Despite this condition, Tenant's prior counsel nevertheless informed the Housing Authority that Tenant refused to participate in the recertification process. In the same vein, Tenant herself admitted that she had not recertified in a timely manner.

Based on our review of the record, it is apparent that Tenant's failure to participate in the recertification warrants her eviction. Section VII(c) of the lease unambiguously sets forth a tenant's obligations regarding the recertification process and explicitly provides that failure to supply information when requested is a serious violation of the terms of the lease and may result in termination. Tenant's then-counsel informed the Housing Authority that she would not participate in the process; however, following an apparent change of heart, Tenant's new counsel attempted to rectify the situation by first attaching the recertification application to a discovery response in February of 2023, *see* Trial Transcript, N.T. at 341-42, and later including it as an attachment to Tenant's Trial Brief. O.R., 215 C.D. 2024 at No. 32. Clearly, attaching the recertification to a discovery response and/or a trial brief does not constitute standard procedure. Further, coupling Tenant's recalcitrant behavior with the overall untimeliness of her submission, it is apparent that Tenant did not make a good faith effort to comply with this lease provision. Thus, we find no error in the trial court's ruling.

### 3.  Tenant's Rent Abatement

Tenant also challenges the trial court's conclusion that she violated the lease agreement by failing to pay rent in July, August, and September of 2022. Tenant does not dispute that failure to pay rent is grounds for termination of the lease agreement; however, Tenant asserts that because her health and safety was jeopardized by the mold in her unit, her failure to pay was justified. Tenant argues that the Housing Authority in essence conceded that there was a habitability issue in her dwelling when it offered her alternative housing. Furthermore, Tenant contends

that the Housing Authority was given adequate time to make repairs prior to her abatement but it failed to do so.

For its part, the Housing Authority maintains that Tenant's argument is based on a faulty premise, *i.e.*, that Tenant's life, safety, and health were jeopardized by the condition of her unit. Per the Housing Authority, there is no credible evidence in the record reflecting that this was the case. To the extent that Tenant argues that the Housing Authority conceded there were habitability issues in the unit, the Housing Authority insists it was merely trying to appease Tenant so that it could perform the necessary work without interference or "harassment." Housing Authority Brief at 18.

In ruling on this dispute, we are reminded of the metaphor of a dog chasing its own tail. Tenant made claims that her unit was uninhabitable because of mold, yet she obstructed the Housing Authority from assessing the situation and making the necessary repairs. At the end of the day, Tenant's uncooperative and obstreperous conduct resulted in her own undoing. Our exhaustive review of the record shows that Tenant did not prove she had legitimate grounds to abate her rent. Thus, we conclude the trial court correctly held that Tenant improperly withheld rent in violation of the lease agreement.

## C. **Trial Court's Order of Possession**

Tenant's final issue focuses on the trial court's direction that, in the event Tenant failed to vacate the premises as set forth in its order, the Housing Authority could seek an order of possession for [Tenant's] premises . . . from the Office of [the MDJ]." Trial Court's Verdict, 6/14/23, R.R. at 99-102. Citing Section

23

503(b) of The Landlord and Tenant Act of 1951 (Landlord Tenant Act),[10] Tenant argues that a judgment for possession cannot be enforced by an order; rather, the proper procedure is to seek a writ of possession.[11]  Notably, the Housing Authority

---

[10] Act of April 6, 1951, P.L. 69, *as amended*, added by the Act of July 6, 1995, P.L. 261, No. 36, 68 P.S. §250.503(b).  Section 503 states:

> (a) On the day and at the time appointed or on a day to which the case may be adjourned, the [MDJ] shall proceed to hear the case. If it appears that the complaint has been sufficiently proven, the [MDJ] shall enter judgment against the tenant:
>
> (1) that the real property be delivered up to the landlord;
>
> (2) for damages, if any, for the unjust detention of the demised premises; and
>
> (3) for the amount of rent, if any, which remains due and unpaid.
>
> (b) At the request of the landlord, the [MDJ] shall, after the fifth day after the rendition of the judgment, issue a writ of possession directed to the writ server, constable or sheriff commanding him to deliver forthwith actual possession of the real property to the landlord and to levy the costs and amount of judgment for damages and rent, if any, on the tenant, in the same manner as judgments and costs are levied and collected on writs of execution. This writ is to be served within no later than forty-eight hours and executed on the eleventh day following service upon the tenant of the leased premises. Service of the writ of possession shall be served personally on the tenant by personal service or by posting the writ conspicuously on the leased premises.
>
> (c) At any time before any writ of possession is actually executed, the tenant may, in any case for the recovery of possession solely because of failure to pay rent due, supersede and render the writ of no effect by paying to the writ server, constable or sheriff the rent actually in arrears and the costs.

[11] The trial court did not address this issue, reasoning that because Tenant remained in possession of the unit, the issue was moot.

24

concedes that the trial court erred in attempting to streamline the possession process by instructing the MDJ to order possession of the unit at the request of the Housing Authority rather than requiring it to follow the procedures set forth in the Landlord Tenant Act.

We agree that the trial court erred in ordering that the Housing Authority could immediately recover possession of Tenant's unit by presenting the MDJ with the trial court's order and we reverse the trial court in this respect. We reiterate that the Housing Authority must follow the procedures set forth in the Landlord Tenant Act in order to recover possession of the premises.

## VI.   CONCLUSION

This Court does not take eviction proceedings lightly. Regrettably, our comprehensive review of the record in this case leads us to conclude that the trial court did not err in denying Tenant's appeal. Accordingly, we affirm the order of the trial court in all respects, apart from the directive that the requirements of the Landlord Tenant Act can be disregarded. In that respect, the order of the trial court must be reversed.


_____
MICHAEL H. WOJCIK, Judge

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Housing Authority of          :
Lackawanna County            : **CASES CONSOLIDATED**
                                 :
         v.              : No. 215 C.D. 2024
                                 : No. 512 C.D. 2024
Denise Schnars,               :
                                 :
           Appellant    :

# O R D E R

AND NOW, this 5th day of February, 2025, the September 18, 2023 order of the Court of Common Pleas of Lackawanna County (trial court) is **AFFIRMED** in all respects, with the exception of the directive that the Housing Authority of Lackawanna County (Housing Authority) may acquire immediate possession of Denise Schnars' apartment unit. To the extent the trial court ordered that the requirements of The Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, *as amended*, 68 P.S. §§250.101-250.603, could be disregarded, the order is **REVERSED**. The Housing Authority may recover possession of the premises by following the procedures outlined in The Landlord and Tenant Act of 1951.

_____
MICHAEL H. WOJCIK, Judge